Filed 8/27/21  Franecke v. Melkonian CA1/4
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| LOUIS S. FRANECKE,<br><br>     Petitioner and Appellant,<br><br>v.<br><br>RITA MELKONIAN,<br><br>     Respondent. | A160327<br><br>(Marin County<br>Super. Ct. No. FL1400242) |

Louis S. Franecke appeals from the trial court's determination that he failed to establish his entitlement to reimbursement under Family Code[1] section 2640 for claimed separate property contributions to improvements to a community property residence.  We affirm.

**BACKGROUND**

This is the third appeal in the parties' marital dissolution action regarding division of their community estate.  We summarize here the background and facts pertinent to the issue presented in this appeal, incorporating where relevant our

_____

[1] All further statutory references are to the Family Code unless otherwise stated.

1

recitation of the facts from our first opinion.[2] (*In re Marriage of Franecke* (June 28, 2019, A151670) [nonpub. opn.] (*Franecke I*).)

Franecke and Melkonian entered into a premarital agreement (PMA) prior to their 1999 marriage. In 1998, the parties contracted with Masma Construction (Masma) for the purchase of a lot on Miwok Drive in Novato and construction of a residence there. In the PMA, the parties agreed that the Miwok residence was community property.

The course of the house acquisition and construction was not smooth. In 2001 and 2002, two mechanic's liens were recorded against the house, as well as a notice of default. To save the residence from foreclosure, Franecke, on behalf of himself and Melkonian, purchased the first and second mortgages and obtained clear title to the property after successfully bidding at a public foreclosure sale. Franecke also sued Masma, and that case settled for a payment by Masma to the parties.

In October 2016, the trial court conducted a bench trial in this dissolution action on issues related to the PMA and the residence. In May 2017, the trial court issued a statement of decision. The court found that (1) pursuant to the PMA, settlement funds recovered from the Masma lawsuit were community property; (2) on his section 2640 claim for reimbursement for separate property contributions for the down payment on the residence, Franecke was entitled to no more than

---

[2] The second appeal in this matter addressed the trial court's ruling on a request by Melkonian for attorney fees and sanctions. (*In re Marriage of Franecke* (Oct. 30, 2020, A159776) [nonpub. opn.] (*Franecke II*).)

2

$350,000 pursuant to the PMA; (3) by signing the PMA, Franecke waived his right to section 2640 reimbursement for separate property contributions to improvements to the residence; (4) laches barred Franecke's section 2640 claim for reimbursement for mortgage, taxes, and insurance payments; (5) Melkonian did not prove her section 2640 claim for reimbursement for improvements; and (6) Franecke was not chargeable with the reasonable rental value of the residence, post-separation. The court entered judgment on reserved issues, and Franecke appealed.

This court affirmed the May 2017 judgment on reserved issues in most respects, but we reversed the judgment in part, finding that the trial court erred in ruling that Franecke waived his right to section 2640 reimbursement of separate property contributions for improvements to the residence. (*Franecke I, supra,* A151670.) Noting that Franecke had claimed $362,144 in separate property contributions to improvements and upgrades to the residence, we found that the trial court should ascertain on remand whether he had met his burden of proof on this issue. (*Ibid.*) Thus, in our disposition, we remanded "to the trial court to determine whether Franecke has met his burden of proof with respect to the $362,144 in claimed separate property contributions to the Miwok house under section 2640 and to award Franecke any property he is owed under that statute." (*Ibid.*)

Following remand, the trial court set a hearing and briefing schedule. The trial court specifically instructed Franecke in his

3

briefing to "cite the court to portions of the record which support and document [Franecke's] claimed reimbursements and to demonstrate that none of his claimed [section] 2640 reimbursements in the sum of $362,144 were already taken into account in the court's award of $350,000 in reimbursements per the parties premarital agreement contained in the May 1, 2017 judgment."[3]  Following briefing and a lengthy hearing on December 5, 2019, the trial court on December 23, 2019 issued an order finding that Franecke had not met his burden of proof on the section 2640 reimbursement issue.

In its order, the trial court noted that Franecke claimed, for the first time on remand, that he was entitled to reimbursement of $608,616.24 and he advanced arguments "which have never before been presented to this court or the Court of Appeal, which exceed the scope of the remand order and which are factually and legally incorrect."  One of those arguments was that Franecke was entitled to $85,000 in reimbursement for his loan-financed

_____

[3] In the "summary of the appeal and relief sought" in the beginning of his opening brief, Franecke states the trial court erred by requiring him to show that none of his claimed reimbursements were part of the $350,000 down payment reimbursement.  He does not raise this contention elsewhere in his brief, thus forfeiting it by failing to separately argue the claim.  (Cal. Rules of Court, rule 8.204(a)(1)(B); *Pizzaro v. Reynoso* (2017) 10 Cal.App.5th 172, 179–181.)  In any event, as explained in more detail, *post*, the record indicates that at least one check that Franecke used to support his claim for improvement reimbursements may have been a check to Masma for a deposit that Franecke testified was part of his down payment, so the trial court had good cause for its order.

4

payoff of mechanics' liens.  The court rejected this claim because, at trial, Franecke included this item in the amount he sought in reimbursement for the down payment on the residence, and this court affirmed the trial court's decision capping that amount at $350,000.

Regarding the separate $362,144 for improvements to the residence that Franecke claimed were reimbursable at trial, the trial court reasoned that, to prevail on this section 2640 claim, Franecke had to show that (1) the source of the money spent was his separate property and trace each payment to a separate property source; (2) he actually spent the money and that it was for a capital improvement that improved the value of the real estate and (3) the improvements actually increased the value of the property, citing *Marriage of Braud* (1996) 45 Cal.App.4th 797, 822.  The court found, "Because of the terms of the parties' premarital agreement, the court finds that all monies [Franecke] may have spent on Miwok after marriage were spent with his separate funds."  Nonetheless, the court found that Franecke had not met his burden of proving his expenditures on improvements. Lastly, the court found that Franecke made no effort to prove that any of the items on his purported list of expenses actually increased equity in the residence.

On December 31, 2019, Franecke filed a motion for reconsideration under Code of Civil Procedure section 1008 and for relief under Code of Civil Procedure section 473 due to mistake, inadvertence, or excusable neglect.  On February 11, 2020, he filed a supplemental memorandum of points and

5

authorities and a supplemental declaration. On March 11, 2020, the trial court denied Franecke's motion for reconsideration because he did not prove any new facts, circumstances, or law unavailable to him at the time of the remand hearing. The court also denied Franecke's motion for relief under Code of Civil Procedure section 473 because he made no effort to demonstrate "mistake, inadvertence, surprise, or excusable neglect." On March 19, 2020 and May 15, 2020, Franecke filed a notice of appeal and an amended notice of appeal.

Meanwhile, Melkonian had moved for attorney fees under sections 2030 and 2032, as well as sanctions under section 271, and the trial court denied the motion without prejudice to Melkonian raising her requests at the end of the case. Melkonian filed a separate appeal seeking review of the trial court's order in March 2020. In an unpublished opinion, this court ordered the trial court to consider Melkonian's pendente lite application for attorney fees and found that, because no judgment had been entered on the trial court's section 2640 ruling on remand, the trial court did not abuse its discretion in electing to consider Melkonian's sanctions motion at the end of the case. (*Franecke II, supra,* A159776.) After remand, on February 2, 2021, the trial court entered an amended judgment against Franecke on the reserved issue of the section 2640 reimbursement.

## DISCUSSION

### I. Jurisdiction

We first address our appellate jurisdiction (*West v. Arent Fox LLP* (2015) 237 Cal.App.4th 1065, 1069) because the

6

existence of an appealable order or judgment is a jurisdictional prerequisite to an appeal, as is a timely filed notice of appeal. (*Canandaigua Wine Co., Inc. v. County of Madera* (2009) 177 Cal.App.4th 298, 302; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2020) ¶ 3:4.)

Melkonian contends that Franecke's notice of appeal was untimely because he filed it over sixty days after notice of entry of the court's December 23, 2019 order, and Franecke filed an invalid motion for reconsideration that did not extend the time within which to appeal under California Rules of Court, rule 8.108(e)[4]. Franecke counters that his motion for reconsideration was valid, rendering his appeal timely. Both parties err in relying on rule 8.108(e). This rule provides an extension of time to appeal *an appealable order* where a party serves and files a valid motion to reconsider the order under Code of Civil Procedure section 1008, subdivision (a). (Rule 8.108(e).) Here, the December 23, 2019 order on remand was not the appealable judgment. (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2020) ¶ 2:257.1 [the general rule is

---

[4] All further rule references are to the California Rules of Court unless otherwise indicated.

Rule 8.108(e) provides, "If any party serves and files a valid motion to reconsider an appealable order under Code of Civil Procedure section 1008, subdivision (a), the time to appeal from that order is extended for all parties until the earliest of: [¶] (1) 30 days after the superior court clerk, or a party serves an order denying the motion or a notice of entry of that order; [¶] (2) 90 days after the first motion to reconsider is filed; or [¶] (3) 180 days after entry of the appealable order

a statement of decision is not the appealable judgment].) Thus, rule 8.108(e) does not apply.

We nonetheless have jurisdiction over this appeal. Following remand after the second appeal in this case, the trial court reduced its December 23, 2019 order to an amended judgment on reserved issues, and we exercise our discretion to treat Franecke's notice of appeal prior to entry of the amended judgment as an appeal from that judgment. (*Wolf Metals, Inc. v. Rand Pac. Sales, Inc.* (2017) 4 Cal.App.5th 698, 702, fn. 1; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2020) ¶¶ 2:264, 3:54.)

## II.   Section 2640 Reimbursement

### A. Additional Background

At trial, Franecke supported his claim for section 2640 reimbursement with his testimony and exhibits 3 and 25. Franecke testified that exhibit 3 was a "flow sheet" of costs associated with construction of the residence. He said that, "[m]ore or less" contemporaneously, "what I was doing was, within a reasonable degree of accuracy, was recording what I was paying and for what to keep track of it." When asked whether he created exhibit 3 to document the improvements he claimed to have made to the residence, Franecke answered, "No." Rather, "[t]he original purpose of the ledger or flow sheet was to document for my own information and frankly for [Melkonian's] the expenditures I was making on a house that we were buying and putting money in. I wanted to know what it was gonna cost." Regarding the entries on exhibit 3, the court asked Franecke, "Do

8

you have a receipt, canceled check, credit card bill, or invoice to back up each and every one of these?" He responded, "Yes." He further testified, "Exhibit 3 is accurate as to when what I recorded was spent. Even that doesn't have everything that I spent on it. But I'm willing to live with it."

After Melkonian's counsel stated that she had not seen back-up for certain items in exhibit 3, the court took a long recess to allow Franecke to collect the back-up documentation. After the recess, Franecke stated that he could not find raw data or checks to back up the requested entries.

Later in trial, Franecke proffered exhibit 25. When asked what exhibit 25 was, he said, "The initial flow sheet that's been marked, I believe, Exhibit 3, has all of the payments that were made at the time, entered more or less at the time that I made them. [¶] In trying to reconstruct what they were for, in addition to that flow sheet—because the flow sheet is the real key document—now, 15 years later, I kept trying to dig out things in a way that would at least back up what—at least some of what shows in the flow sheet. [¶] So I then put this in an order that was a bit more readable. And that is, is that in the beginning pages—you'll see the upper right-hand corner there are page numbers—Pages 1 through 40 contain what I circled as being costs for the house, for the construction of the house, that I put in. . . . [¶] But the second part, Pages 41 through 60, are copies of checks that I was able to locate that all are the backup of checks of monies that I paid to construct the house." Exhibit 25, Franecke confirmed, "corroborates the flow sheet that has the

numbers on it of what was expended by me for the house." Franecke clarified of exhibit 25, "[T]his is not all of the expenditures. The flow sheet shows what actually was spent." When asked by his counsel whether he had been unable to find all back-up statements or checks, Franecke replied, "Not back that far. I couldn't find all of them."

Respondent's counsel cross-examined Franecke about a number of circled credit card charges in exhibit 25, and Franecke conceded that he assumed certain entries were for improvements or that he could not verify certain entries. In response to cross-examination regarding three checks to Scott Smith and one check to Holt & Collins, Franecke said that the check to Holt & Collins "just happened to be" included in Exhibit 25 and was an investment in stock that he was no longer claiming as a reimbursable item, and he did not remember who Scott Smith was, but, due to a "Masma" notation on one check, "obviously it was something having to do with either Masma's work and Masma construction and/or improvements on the house." The following day, Franecke proffered exhibit 30, which was a list of twenty credit card charges in exhibit 25 for which he withdrew his claim for reimbursement because he reviewed this exhibit again and was unsure what the charges were for.

On the issue of whether Franecke had established that he spent the money listed in exhibit 3, the trial court found in its order on remand as follows: "Trial Exhibit 3 is a handwritten document. [Franecke] describes it as a running total of Miwok expenditures and receipts. It is difficult to follow, in that some

10

entries are made in a column headed 'BILLED,' and some in a column headed 'PAID,' with no apparent attempt to correlate the two. Entries for which [Franecke] claims [section 2640] reimbursement include such undeniably non-capital items as delivery and moving services, cleaning, repairs, gardeners, and household contents. [¶] [Franecke] also made no attempt to correlate the line items in Exhibit 3 with actual payment of any bills. At trial, when [Melkonian] questioned whether [Franecke] could prove that he had actually paid the line items in Exhibit 3, he proffered Exhibit 25. This exhibit has little relationship to Exhibit 3. [¶] [Franecke] included in Exhibit 25, as evidence of reimbursable expenses, such items as: [¶] 1. check to Holt and Collins in the sum of $25,040.61. That item does not appear on Exhibit 3 at all, and [Franecke] now admits it was a check to his investment advisors. [¶] 2. A Citibank credit card charge to Teatro Zinzanni in the sum of $260.50. Teatro Zinzanni was a dinner theater in San Francisco. [¶] Many of the pages on Exhibit 25 are blank in the column where the vendor is supposed to be listed."[5] The court continued, "The case of *Exclusive Florists, Inc. v. Kahn* (1971) 17 Cal.App.3d 71[1], is instructive. In that case a florist sued to recover for flowers used at a wedding. The plaintiff florist proffered a clear and concise compilation or summary of the charges, based upon his business records. The testimony of the company's vice-president was found sufficient, because each

_____

[5] The court's reference to a $25,040.61 check to Holt & Collins appears to be a typographical error; exhibit 25 shows a check to Holt & Collins in the amount of $45,040.61.

11

item was documented and tallied to purchase orders and invoices maintained by the business.  [Franecke] did none of that in this case, either at trial or on remand."

### *B. Governing Legal Principles and Standard of Review*

Under section 2640, a spouse has a right to reimbursement at the time of dissolution for any separate property payments for contributions to the acquisition of community property, unless there has been a written waiver.  (§ 2640, subd. (b); *In re Marriage of Cochran* (2001) 87 Cal.App.4th 1050, 1056–1057.)  Section 2640 states that " 'contributions to the acquisition of property . . . include down payments, payments for improvements, and payments that reduce the principal of a loan used to finance the purchase or improvement of the property.' " (§ 2640, subd. (a).)  The statute specifically excludes from reimbursement "payments of interest on the loan or payments made for maintenance, insurance, or taxation of the property." (§ 2640, subd. (a).)  The party seeking reimbursement has the burden of proof.  (§ 2640, subd. (b); *In re Marriage of Cochran,* at pp. 1057–1058.)

Where, as here, the trier of fact has expressly concluded that the party with the burden of proof did not carry the burden and that party appeals, " 'it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment . . . . [¶] Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.  [Citations.]  Specifically, the

question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " (*Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838.)

This is "an onerous standard" (*Ajaxo, Inc. v. E\*Trade Financial Corporation* (2020) 48 Cal.App.5th 129, 164), and one that is "almost impossible" for a losing plaintiff to meet, "because unless the trial court makes specific findings of fact in favor of the losing plaintiff, we presume the trial court found the plaintiff's evidence lacks sufficient weight and credibility to carry the burden of proof. [Citations.] We have no power on appeal to judge the credibility of witnesses or to reweigh the evidence." (*Bookout v. State of California ex rel. Department of Transportation* (2010) 186 Cal.App.4th 1478, 1486 (*Bookout*).)

Furthermore, we "must resolve all conflicts in the evidence in favor of the prevailing party and must draw all reasonable inferences in support of the trial court's judgment." (*Leung v. Verdugo Hills Hospital* (2012) 55 Cal.4th 291, 308 [affirming jury verdict].) " ' " 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " ' " (*Bloxham v. Saldinger* (2014) 228 Cal.App.4th 729, 750.) Indeed, "the [trier of fact] is not required to believe the testimony of any witness, even if

uncontradicted." (*Sprague v. Equifax, Inc.* (1985) 166 Cal.App.3d 1012, 1028.)

## C. Analysis

As explained below, Franecke's evidence was not unimpeached and of such character and weight as to leave no room for the trial court's determination that he had failed to satisfy his burden of proof.

Starting with exhibit 3, Franecke testified this was a handwritten "flow sheet" of costs associated with construction of the residence. Exhibit 3 is four pages in length with a total of nearly 150 line item entries. Franecke's testimony was that exhibit 3 was not specific to improvements and was instead a running tally of costs related to the residence's construction. The trial court observed the exhibit contained entries for non-capital items such as delivery and moving services, cleaning, repairs, gardeners, and household contents. Further, exhibit 3 contains "billed" and "paid" columns, but those columns are not consistently populated, and, where they are, for certain entries the two amounts do not match. Franecke did not explain the discrepancies. Indeed, the trial court remarked that there was "no attempt to correlate" the "billed" and "paid" columns.

Franecke next introduced exhibit 25 to try to "reconstruct" what the entries in exhibit 3 were for. This is a one-hundred and twenty-seven page document. Franecke testified that the first forty pages included circled costs "for the construction of the house" on credit card statements, followed by approximately twenty pages of "copies of checks" that he testified were "the

14

backup of checks of monies that I paid to construct the house." But cross-examination cast doubt on whether numerous circled credit card entries in exhibit 25 in fact represented charges for improvements.

After cross-examination on exhibit 25, Franecke drafted exhibit 30 to withdraw the credit card charges that he could not say were for improvements, but that did not cure all the issues with exhibit 25. Franecke testified that the remainder of the documents within exhibit 25 supported what he "put into the house . . . . I'm telling you . . . that these were moneys that were expended on the house for its construction, other than what I have just testified that I am not claiming at this point." Yet, cross-examination showed there were remaining credit card entries that Franecke could not link specifically to improvements. Franecke conceded, for example, that he did not have specific recollections of what he bought at Orchard Supply and Spectrum Home Furnishings, but he assumed the charges were for the residence. Certain circled credit card entries do not appear in or match line items in exhibit 3. And, as the trial court observed, the area in the credit card statements on a number of pages in exhibit 25 that would presumably show the vendor associated with a circled charge is inexplicably blank.

There were additional discrepancies in exhibit 25. For example, there are three checks to Scott Smith, one with a "Masma" notation, but Franecke could not remember who Smith was; he testified only that such checks were "obviously" for "Masma's work and Masma construction and/or improvements on

15

the house." There is also a check to the Marin Superior Court, a check to the Marin County Recorder, and a number of checks seemingly to title companies. A number of the check charges do not appear in exhibit 3, such as a check to Melkonian for $10,100, two title company checks, and a $10,000 check to 3C Construction. Franecke testified that another $12,000 check to Masma marked "deposit" may have been part of the amount he sought as the down payment. Exhibit 25 also contains invoices to "House Construction" for $7,100, marked "paid" in the amount of $4,000 with a "balance due" of $3,100, and Franecke matched these to a check for $7,100. When asked about the discrepancy between the invoice paid and due amounts and the $7,100 check, Franecke did little to clarify the matter. Finally, exhibit 25 contains only copies of check fronts without the backs showing the endorsements. In sum, the evident discrepancies in exhibit 25 provided cause for the trial court to doubt its reliability as a whole.

Next, Franecke relies on photographic evidence in trial exhibits 19, 20, and 316. He claims that they show the improvements for which he seeks reimbursement, but these exhibits were not introduced for this purpose. Franecke identified exhibit 19 as a compilation of pictures of the residence taken before Melkonian moved out in 2014, and exhibit 20 as "photographs for purposes of showing what the condition of the house was before [Melkonian] took the things she took, and the condition after she took the things she took." Franecke submitted these exhibits to support his disagreement with

16

Melkonian's appraiser's opinion of the rental value of the residence. The testimony regarding exhibits 19 and 20 that Franecke points to does not specifically link any item pictured to a cost incurred by Franecke. And, although Franecke states that he provided "a detailed list of what claimed items paid by Franecke are identified in the photographs," he submitted his list *after* our remand, so this list was not part of the trial evidence. Exhibit 316 is an analysis of the fair market rental value of the residence for 2014 to 2016, and, while it mentions the "good" condition and "excellent quality construction" of the residence, it does no more. These exhibits do not prove Franecke's claim as a matter of law.

The same is true for Franecke's trial testimony, which lacked specific detail. Franecke did not go through exhibit 3 to identify each line item that he contended constituted an improvement; he did not match each back-up document in exhibit 25 to the entries in exhibit 3 at trial;[6] he did not specifically

---

[6] Franecke attempted to correlate certain entries in exhibit 3 to documents in exhibit 25 in his supplemental papers in support of his motion for reconsideration and relief under Code of Civil Procedure sections 1008 and 473. Franecke states in the introductory "summary of the appeal and relief sought" in his opening brief that the trial court wrongly found that his supplemental papers were untimely, but he forfeited any challenge to this ruling by failing to separately brief and argue the issue. (Rule 8.204(a)(1)(B); *Pizzaro v. Reynoso, supra*, 10 Cal.App.5th at pp. 179–181.) In any event, his claim would not result in reversible error given that he fails to challenge the trial court's substantive rulings that he did not prove any new facts, circumstances or law that were unavailable to him at the time of the remand hearing, and that he made no effort to

17

testify what each claimed charge, check, and invoice in exhibit 25 was for; and he did not testify to how he maintained the purported back-up documentation submitted, saying instead, "[N]ow, 15 years later, I kept trying to dig out things in a way that would at least back up what—at least some of what shows in the flow sheet." Because the trial court did not make specific findings of fact in favor of Franecke in its order in remand, we presume that it found that his evidence, including his testimony regarding the costs of alleged improvements he paid for, lacked the weight and credibility necessary to satisfy his burden.[7] (*Bookout*, *supra*, 186 Cal.App.4th at p. 1486.)

---

demonstrate "mistake, inadvertence, surprise, or excusable neglect."

[7] Review of Franecke's post-remand briefing in the trial court is illustrative of the questions his evidence raises. Adding together the amounts listed in demonstrative exhibit O, which is the "check and invoice history" that Franecke submitted with his opening brief on remand, and subtracting the $45,040.61 check to Holt & Collins, the total is approximately $325,244. Yet Franecke listed a total "checks and invoices" claim for $299,017 in his opening brief. Adding together the credit card charges in Franecke's demonstrative exhibit P, the total is more than $64,000, yet Franecke told the court that this claim was for $62,460. In his reply brief below, Franecke revised his reimbursement claim to $388,712.24, which purportedly consisted of "Flow sheet payments supported [by] credit card and checks and invoices testimony and exhibits." Even if we speculate that Franecke included in the $388,712.24 claim the $42,000 initial Masma deposits (which he had previously testified were actually part of his down payment) and subtract that $42,000 figure, his total claim was $346,712.24 in his reply brief, whereas his total claim in his opening brief was $361,447. These discrepancies are not explained in the post-remand briefing, let alone in the previous trial testimony. The trial court was left to

18

This is not a case where there was no room for a judicial determination that the evidence was of insufficient weight and credibility to satisfy Franecke's burden of proof. Indeed, during trial, the court stated that the fact that Franecke had not proffered or organized back-up documentation correlated to the line items in exhibit 3 and the fact that he did not withdraw in exhibit 30 entries that he conceded should not have been included in exhibit 25, such as the check to Holt & Collins, went to the weight of the evidence. And, while Franecke claims that Melkonian admitted the claimed items in exhibit 25 were installed and made a part of the residence by her failure to testify otherwise, that is not how the burden of proof works. That Melkonian produced no contradictory evidence on an issue where Franecke bore the burden of proof does not mean that Franecke carried his burden.[8]

Finally, *Exclusive Florists, Inc. v. Kahn* (1971) 17 Cal.App.3d 711, 714, relied on by Franecke, which found summaries of business records to be properly admitted under the "voluminous writing" doctrine of former section 1509 of the Evidence Code, does not compel a different result. The issue here

speculate regarding which charges in exhibit 25 were included in Franecke's claims.

[8] Franecke asserts many times in briefing that Melkonian paid nothing for any improvements and admitted that she paid nothing. We note that, in doing so, Franecke does not substantiate his assertions, either providing no cite to the record at all or citing to the court's inapposite finding in its May 2017 statement of decision that Melkonian did not pay one-half the mortgage, taxes, or insurance on the residence.

19

is not admissibility of summaries of business records, and it is the sole province of the trial court to assess the weight and credibility of the evidence before it. (*Bookout*, *supra*, 186 Cal.App.4th at p. 1486.)[9]

## III. The Mechanics' Liens

On remand, Franecke expanded his request for reimbursement under section 2640 from $362,144 for alleged improvements to over $600,000, including a request for $85,000 financed by loans that he states paid off mechanics' liens on the residence. The trial court rejected Franecke's claim for $85,000, ruling as follows: "For the first time on remand, [Franecke] claims that he is entitled to [section] 2640 reimbursements for improvements and upgrades in the sum of $608,616.24 (see [Franecke's] reply brief at 17:16). In so doing, [Franecke] advances arguments which have never before been presented to this court or to the Court of Appeal, which exceed the scope of the remand order, and which are factually and legally incorrect. This court will not entertain them." Specifically addressing the $85,000 claim, the trial court further stated, "At trial, [Franecke] included this item in his claim that he was entitled to $524,704 in down payment reimbursements. The Court of Appeal found that [Franecke's] reimbursement entitlement for the down payment on Miwok was limited to $350,000, by the terms of the parties' premarital agreement."

---

[9] Given our resolution of this issue, we need not address Franecke's assertion of error with respect to the trial court's ruling that he was required, but failed, to show that any alleged improvement actually increased equity in the residence.

Franecke fails to show error in the trial court's ruling. (*Case v. State Farm Mutual Automobile Ins. Co., Inc.* (2018) 30 Cal.App.5th 397, 401–402 [a judgment of the lower court is presumed correct, and appellant bears the burden of establishing error on appeal].)  In the prior appeal, we recognized that, apart from his claim for reimbursement for a $524,704 down payment, Franecke sought $362,144 under section 2640 as reimbursement for "improvements and upgrades" to the residence.  We reversed the ruling below that Franecke had waived this $362,144 reimbursement claim, and we remanded the matter for the limited purpose of requiring the trial court to decide whether Franecke had met his burden of proof on his $362,144 claim for reimbursement related to improvements.  The trial court then denied Franecke's $85,000 request because it was a new claim for reimbursement for improvements and because he previously included this item as part of the $524,704 down payment.  On appeal, Franecke does not address the court's finding that he had not previously presented his claim for reimbursement for principal payments of $85,000 on a loan used to finance improvements, and he mentions only in his reply brief the court's finding that he had included the item in his claim for reimbursement of his down payment.  He thus does not establish reversible error on appeal. (See *Case v. State Farm Mutual Automobile Ins. Co., Inc.*, at pp. 401–402; *SCI California Funeral Services, Inc. v. Five Bridges Foundation* (2012) 203 Cal.App.4th 549, 573, fn. 18 [appellant cannot salvage a forfeited argument by addressing it belatedly in a reply brief].)  If there were $85,000 in

21

payments made to reduce the principal on a loan that financed improvements, this situation could fall within the listed reimbursable items in section 2640. In his argument related to the $85,000, however, Franecke merely says he is owed $85,000 rather than using record evidence to show he made that amount in payments that reduced the principal of a loan. Similarly, in his reply brief on appeal, he claims that the down payment was only $440,000 (without citation to portions of the record that actually support this contention), yet he specifically argued below and in the earlier appeal that the down payment was $524,704 or $524,705.

## DISPOSITION

The judgment is affirmed.


BROWN, J.


WE CONCUR:

STREETER, ACTING P. J.
TUCHER, J.


*Franecke v. Melkonian* (A160327)

22